O'Neill RYAN and United States Trust Company of New York, as Trustee of a Trust dated April 15, 1968 for the benefit of Sara Ryan Hill, Plaintiffs,

v.

J. WALTER THOMPSON COMPANY, Defendant.

No. 69 Civ. 2249.

United States District Court, S. D. New York.

Jan. 29, 1971.

Kissam & Halpin, New York City, for plaintiffs; Leo T. Kissam, Anthony S. Genovese, Robert A. Warren, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendant; Edward J. Ross, Miriam C. Feigelson, New York City, of counsel.

WYATT, District Judge.

These are motions for summary judgment, the first in time by defendant and the other by plaintiffs. Fed.R.Civ.P. 56. All parties agree that there is no genuine issue as to any material fact and that summary judgment is appropriate. Each side insists that summary judgment must be for it. The conclusion reached is that defendant is entitled to summary judgment.

The action is brought under Section 10(b) of the Securities Exchange Act of 1934 ("the Act"; 15 U.S.C. § 78j) and Rule 10b–5 thereunder. Jurisdiction is claimed under Section 27 of the Act (15 U.S.C. § 78aa) and "the doctrine of pendent jurisdiction". There is no claim to diversity jurisdiction and apparently there is none in fact, plaintiffs being citizens of New York and defendant, whether treated as a New York or a Delaware corporation, has its principal place of business in New York (28 U.S.C. § 1332(c)).

The complaint in one count asks for rescission of a sale of stock by plaintiffs to defendant. The sale was made on the exercise by defendant of an option which the complaint avers was unenforceable at the time of its exercise. The complaint also avers that defendant, as purchaser, failed to disclose a material fact to plaintiffs (a contemplated public offering of Thompson stock) and that had plaintiffs known such fact they would not have made the sale.

The facts are as follows.

J. Walter Thompson Company was founded in 1864 and was incorporated in New York in 1907. At all relevant times it was the largest advertising agency in the world.

This action was commenced on May 26, 1969, defendant being described as a New York corporation, which it then was. The New York corporation, however, after March 1969 had a wholly owned subsidiary, a Delaware corporation. For reasons which will later appear, the New York corporation on June 12, 1969 was merged into its Delaware subsidiary which was the surviving corporation.

When the answer was served and filed on July 16, 1969, the answering defendant described itself as a Delaware corporation and recited the corporate events mentioned. These do not appear to be of significance here. "Thompson" will be used to refer to defendant and to its predecessor.

Plaintiff Ryan was employed by Thompson in three different periods: from 1932 through 1936; again from 1941 through 1950; and again from 1954 until January 31, 1966 when he retired for age.

Thompson had a fixed policy that the business should be owned by those who were active workers in its employ. From time to time, therefore, Thompson made available shares of its capital stock to its officers and other employees. If its policy were to be effective, Thompson had to be able to buy back its stock whenever any holder desired to sell or ceased to be an employee. Accordingly, when its shares were sold, Thompson re-

served an option to repurchase; it was the fixed policy to exercise all such options in aid of the primary policy that Thompson should be wholly owned by its employees.

Ryan bought no stock in his first employment period. He did buy stock in his second employment period. He resigned from his employment on September 18, 1950 and shortly thereafter Thompson, exercising its option, repurchased his stock.

Ryan returned to the employment of Thompson in 1954. Ryan purchased capital stock from Thompson in 1956, 1957, 1960 and 1963. The purchase price, according to the practice of Thompson, was net asset value excluding any value for good will.

Effective December 31, 1964, Thompson had a retirement age of 65 for all employees.

As already noted, the shares owned by Ryan (and all other shares) were subject to an option in Thompson to repurchase in certain events. The terms of the option were expressed in the certificate of incorporation of Thompson. Among other events, Thompson had an option to repurchase the stock when Ryan ceased to be a director, officer or employee of Thompson by reason of his retirement. This option could be exercised between January 1 and March 31 of the third year after the year in which retirement occurred. The option price was specified and for common stock was the net asset value, excluding any value for good will. It was specifically provided that "in all cases" the decision whether to exercise an option was to be made by the board of directors of Thompson.

After the last purchase of shares by Ryan in 1963, he and the other directors and (apparently) the other employees executed written option agreements. The option agreement executed by Ryan was under date of June 27, 1963. The purpose and effect of this agreement was to vary (among other things, by lengthening) the option period if a stockholder ceased to be a director, officer or employee *before* retirement age.

Ryan became 65 years old during the year 1963 and was therefore scheduled to retire on December 31, 1964. Thompson elected, however, to continue his employment for another year. Before December 31, 1965, it appeared that Ryan required an operation and to give him certain medical benefits available to Thompson employees, the date of retirement was made January 31, 1966. This was done by written agreement under date of December 1, 1965 (signed by Ryan on December 2, 1965). This agreement provided, however, that the option period to Thompson should be the same as if Ryan had retired on December 31, 1965.

Ryan did in fact retire on January 31, 1966. At that time he owned 500 shares of Class A common stock and 1,500 shares of Class B common stock of Thompson. The option to Thompson was exercisable between January 1 and March 31, 1968.

There was a recapitalization of Thompson in April 1966 and a stock dividend in March 1967. As a result of these events, after March 1967 Ryan owned—subject to the option—2,000 shares of 6% preferred stock, 1,000 shares of Class A common stock, and 4,000 shares of Class B common stock of Thompson. Ryan had paid for this stock $83,686 (according to his counsel) or $93,492.23 (according to counsel for Thompson). It is not necessary to determine the exact figure. Whatever it was, nothing was paid for good will as an element of the purchase price.

In October 1967, there was an agreement between Thompson and Ryan—apparently oral—under which the option period to Thompson was postponed for one year to January 1—March 31, 1969. This is said for Thompson to have been at the "urging" of Ryan. In any event, the postponement was a financial benefit to Ryan because, during the additional year he was permitted to retain his shares, the net asset value (and thus op-

tion price) of his common shares increased by $9 per share and there were dividends of $7,150.

In April 1968, Ryan transferred to plaintiff United States Trust Company in trust for his daughter 2,000 shares of 6% preferred stock and 2,250 shares of Class B common stock of Thompson. This is said by Ryan to have been "with the consent of Thompson". Ryan continued to own 1,000 shares of Class A common stock and 1,750 shares of Class B common stock of Thompson. The transfer in trust is of no significance here and all of the stock will be treated as owned by Ryan himself.

In August 1968, Thompson had need of additional working capital and considered in this connection a sale to the public of shares of its stock (sometimes called "going public" or to "go public"). In that month, Thompson began consultations with investment bankers. The sale of stock to the public would mean a significant change in the policy of Thompson to that time.

In October 1968, the investment bankers recommended that shares of Thompson be sold to the public.

By early to middle November 1968, the Thompson management must have reached a decision to sell shares to the public, subject to certain eventualities. One of the most important of these was that the principal clients, when advised, expressed no strong objections.

Having made this decision, Thompson sought an opinion from counsel whether the options maturing in 1969 (such as that in respect of Ryan's stock) should be exercised. Under date of November 13, 1968, counsel advised that, for reasons given, all such options should be exercised.

Under date of January 14, 1969, Thompson notified Ryan that, by decision of the Executive Committee made on the same date, it exercised the option to repurchase his stock. The option price of the preferred stock was par value or $25 per share; the option price of

the common stock (both classes) was $45.24 per share.

Ryan appeared to accept the exercise of the option as normal and reasonable. He wrote to an officer of Thompson that the $45.24 price was "gratifying" and indicated a knowledge of the possibility that Thompson would change its policy and have public stockholders: "if and when JWT goes public I surmise this same asset value, plus mark up for the earnings 'intangibles' would command about $125 * * *".

The sale to Thompson was completed in January 1969 and Ryan received for his stock $276,200 (less a small amount for transfer stamps). Ryan was not advised by Thompson at any time prior to the repurchase of his shares that a public offering was in contemplation.

Talks with the principal clients of Thompson took place in January, February and March 1969 and apparently there was no strong objection to the plan of Thompson to go public.

On March 28, 1969, Thompson filed with the Securities and Exchange Commission a printed form of Registration Statement covering a proposed public offering of shares. On the same date, the president of Thompson advised Ryan of the decision to make a public offering.

On April 10, 1969, Thompson sent out notices of a special meeting of shareholders to consider and act on matters connected with the proposed public offering, principally the plan of merger of the New York corporation into its subsidiary Delaware corporation (recently organized for the purpose).

The meeting of shareholders on May 5, 1969 gave the necessary approvals.

As noted much earlier, the case at bar was commenced on May 27, 1969.

The recapitalization took place as authorized and on June 4, 1969 the public offering was made.

Before the recapitalization, Thompson had exercised all options to repurchase which were capable of being exercised, that is, which had then matured.

As part of the recapitalization, all stock at that time subject to an option in Thompson to repurchase in the future —that is, an option not yet matured for exercise by Thompson—was converted into shares of new common stock and new common stock—Class B. Each share of old preferred stock was converted into one share of new common stock; each share of old Class A common stock was converted into five shares of new common stock; each share of old Class B common stock was converted into one share of new common stock and four shares of new common stock—Class B.

The new common stock was free of any option to Thompson. The new common stock—Class B was subject to an option to Thompson to repurchase, but 25% of such stock was to be automatically changed share for share to common stock (free of option) on June 12 of each year, 1970 through 1973. Moreover, if the holder of new common stock—Class B died, became disabled, or left the employ of Thompson after reaching retirement age all his shares of new common stock—Class B were to be automatically changed share for share to common stock (free of option).

The recapitalization therefore eliminated the option to Thompson, to the extent and under the conditions described, on shares of old stock held at the time of recapitalization by the following:

a. the then officers, directors and employees of Thompson; and

b. any officer, director, or employee who had retired after reaching retirement age and whose retirement occurred after December 31, 1966.

The effect of the recapitalization, certainly well understood in advance, was to add the value of good will to the value of all shares as to which the option to Thompson was eliminated.

Another effect of the recapitalization, doubtless also well understood in advance, was to enable the then officers, directors and employees of Thompson (as well as the others just mentioned

above) to sell as part of the public offering a substantial number of shares of new common stock and at a value reflecting the increment of good will.

The public offering on June 4, 1969 was of 790,000 shares of new common stock at $38 per share. The shares offered and sold represented about 27% of the outstanding shares of Thompson.

Thompson itself sold 350,000 shares. The underwriting discounts and commissions were $2.05 per share. Thompson (with approval of its stockholders) paid all the expenses of the offering. The proceeds of the offering received by Thompson (after deducting estimated expenses) were $12,281,500.

The J. Walter Thompson Company Profit-Sharing Trust sold 109,709 shares, paid no expenses and received as proceeds $35.95 per share or a total of $11,873,961.45. The directors and senior officers held the largest number of shares and received the largest proceeds.

The selling individual stockholders were principally the then officers, directors and employees of Thompson together with those former employees who had retired (after reaching retirement age) after December 31, 1966. It is evident that as to them the recapitalization of Thompson and the public offering produced a windfall.

The disappointment to Ryan was entirely natural. The accidents of timing made the situation all the more painful. Had he been a director and officer at June 4, 1969, or had he retired after instead of during 1966, his holdings of Thompson stock would have had a realizable value far in excess of what he received on exercise of the repurchase option in January 1969.

Had Ryan been able to retain his old shares, in recapitalization these would have been converted into 27,000 new common shares which, at the $35.95 per share price received by the selling individual stockholders on the public offering, would have had a value on June 4, 1969 of $970,650. This figure may be

contrasted with the $276,200 received by Ryan in January 1969.

In appraising this situation, however, it must be remembered that the enforcement of a fixed "cut off" date or of a fixed line of distinction frequently produces results which may be described as in some ways harsh. Moreover and aside from the advice of its counsel, Thompson as a practical matter could not have waived the exercise of its option to repurchase Ryan's stock. If it waived as to Ryan, it would in fairness be required to waive as to all those who retired in 1966. If these options were not exercised by March 31, 1969, the optioned stock would thereafter be free of the option and could be sold to anyone. This result would itself change or seriously affect the long standing practice of Thompson, at a time when there was no assurance that there would be a successful public offering. Thompson had no such assurance until June 4, 1969 when the Underwriting Agreement was executed (the prospectus states that it was so "dated" and its execution on that date is assumed). The underwriters were not bound to take and pay for the new shares until execution of the underwriting agreement. Thompson made it perfectly plain in the material sent to its stockholders that the recapitalization would not take place "if the shares of stock of the Delaware Company are not delivered to and paid for by the Underwriters * * *". If the public offering were not made, Thompson had only the alternative of continuing, at least for some period, under an employee ownership policy as before. This alternative would have been sacrificed or gravely compromised if there had been a failure by Thompson to exercise all matured options to purchase before March 31, 1969, in the case of Ryan and all those similarly situated. Thompson was obliged to exercise the options before March 31, 1969 to guard itself against the possibility of a failure of the public offering thereafter. Thus, the business judgment of the Thompson management was not unfairly or unreasonably exercised.

Whether the options were valid as a matter of law is another question.

### The Validity of the Thompson Option did not Depend Upon the Existence of a Policy That all Stock of Thompson be Owned by its Employees

The necessary contention for plaintiffs is that the option to Thompson can only be valid so long as the policy of Thompson is to require ownership of its shares only by employees (or for a limited period by former employees). This contention is without merit and, being rejected, judgment for defendant must follow.

We may start with the proposition that the option has at all relevant times been part of the certificate of incorporation, referred to on the stock certificates, and known to Ryan when he bought his shares. It is thus a matter of contract between Ryan and Thompson. Why should it not be enforced? Only if against public policy would seem to be the answer.

There is a general public policy against restraints on the transfer of personal property but, at least in recent years, this has not affected the validity of an option to the corporation to buy its shares before a stockholder may sell to another.

It must be emphasized that such an option does not prevent a transfer, nor does it condition a transfer on any consent. The option merely delays a transfer for a period within which the corporation may buy its shares. If the corporation does not buy, there are no restrictions on transfer.

The early decisions which sustained such a "first option" did not do so because it kept ownership in those *employed* by the corporation but because it gave a measure of control to those who *owned* the corporation. For example, in Doss v. Yingling, 95 Ind.App. 494, 500, 172 N.E. 801, 803 (Appellate Court of Indiana, en banc, 1930) it was said:

"The regulation imposed on the alienation of the common capital stock

in this corporation was a reasonable one: It does not prevent the alienation of the stock; no permanent impediment to the transfer is contemplated by the terms of the agreement and by-law. The only purpose was to give to those owning stock the right and privilege to keep the control of the corporation in the hands of those who are its friends and friendly to those intrusted with the administration of its prudential affairs. The restrictions in this instance are not against public policy."

Such a first option was sustained in New York in Cowles v. Cowles Realty Co., 201 App.Div. 460, 194 N.Y.S. 546 (1st Dept. 1922) and Hassel v. Pohle, 214 App.Div. 654, 212 N.Y.S. 561 (2d Dept. 1925).

Then came a reference in New York to the principle that it is against public policy to restrain the transfer of shares of stock, followed by this flat statement (Penthouse Properties v. 1158 Fifth Avenue, 256 App.Div. 685, 11 N.Y.S.2d 417, 422 (1st Dept. 1939)):

"But restrictions against the sale of shares of stock, unless other stockholders or the corporation have first been accorded an opportunity to buy, are not repugnant to that principle".

More recently came the controlling decision in New York, Allen v. Biltmore Tissue Corp., 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812 (1957). There was a 60 day option to the corporation to repurchase its stock before the stock could be sold to others. The option price was the price paid by the stockholder on issuance. The option was in the by-laws. The stock was originally issued, not to employees only, but to others as well. The option was sustained by a unanimous Court of Appeals. Judge (now Chief Judge) Fuld said (emphasis in original):

"The courts have almost uniformly held valid and enforcible the first option provision, in charter or by-law, whereby a shareholder desirous of selling his stock is required to afford the corporation, his fellow stockholders or both an opportunity to buy it before he is free to offer it to outsiders. * * * The courts have often said that this first option provision is 'in the nature of a contract' between the corporation and its stockholders and, as such, binding upon them. * * *

"As the cases thus make clear, what the law condemns is, not a *restriction* on transfer, a provision merely postponing sale during the option period, but an effective *prohibition* against transferability itself."

It is important to note that the first option in and of itself is held to be reasonable, this because it does not prevent transfer but merely delays transfer. There is no suggestion that some other purpose or object must justify the option, much less that this purpose or object be employee ownership. Indeed, in the cited case, the litigant stockholder had never been an employee of the corporation.

True, Judge Fuld says that "generally speaking" the first option restriction is employed by the "close corporation" but it is clear that this is merely by way of description or illustration and not by way of limitation. Moreover, the expression "close corporation" is not used to refer to a corporation wholly owned by its employees but rather to a corporation owned by a small group.

Under the New York decisions, therefore, the first option to Thompson was valid whatever may have been the policy of Thompson in January 1969.

■ Ryan was therefore obligated to sell his shares to Thompson in January 1969. Whatever he knew or did not know made no difference in what he was required to do. There can be no possible claim under Section 10(b) and Rule 10b–5 in such circumstances. See Lawrence v. Sudman, 70 F.Supp. 387, 396 (S. D.N.Y.1945)

There had Been no Change in the Policy of Thompson in January 1969

The contention for plaintiffs is that when the option was exercised in January 1969 Thompson had already decided to go public and thus had changed the policy on which the validity of the option depended.

■ Assuming that such a change in policy would affect the validity of the option, no such change had in fact occurred in January 1969.

It seems clear that Thompson did not change its policy of 100% ownership by employees until June 4, 1969, when the underwriting agreement was signed. It planned to change its policy, expected to change its policy, took steps to change its policy in and before January 1969 but did not in fact change its policy and could not be sure that it would change its policy until June 4, 1969. The reason, as already noted, was that if for any reason the public offering could not be accomplished, Thompson had to be able to continue its then policy of 100% employee ownership; it would be forced to turn to means for raising working capital other than by sale of stock to the public.

When the option was exercised in respect of the stock of Ryan, Thompson was 100% employee owned and might so remain indefinitely.

*The Other Questions Need not be Determined*

There are a number of other issues, such as, for example, whether Ryan had knowledge, when the option was exercised, that Thompson was planning to go public. These issues, while interesting, need not be determined because in the view taken, that the option was valid in January 1969, they do not affect the result.

The view taken additionally involves dismissal of the counterclaim as without merit.

There is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). The Clerk is directed to enter judgment for defendant dismissing the action and for plaintiffs dismissing the counterclaim.

So ordered.