[Civ. No. 34820. First Dist., Div. Two. June 24, 1975.]

YENG SUE CHOW, Individually and as Executrix, etc.,
Plaintiff and Appellant, v.
LEVI STRAUSS & COMPANY, Defendant and Respondent.

316

318

**COUNSEL**

Leonard & Dole, Charles F. Wong and Stuart R. Dole for Plaintiff and Appellant.

Heller, Ehrman, White & McAuliffe, Lloyd W. Dinkelspiel, Jr., M. Laurence Popofsky, Douglas M. Schwab, Ellis & Levy and Willard L. Ellis for Defendant and Respondent.

**OPINION**

**KANE, J.**—This is an appeal from a summary judgment granted in favor of respondent in an action brought for rescission of a stock repurchase option and for restitution. The relevant facts of the case are not in dispute and may be summarized as follows:

Appellant is the widow and executrix of the estate of Arthur Chow, deceased ("Arthur"). Arthur was employed by Levi Strauss & Co. ("the Company") from 1959 until his death on May 27, 1970. During the period of his employment Arthur acquired 11,295 shares of the Company's common capital stock under employee stock purchase plans.

Under these plans key employees were allowed to purchase the stock on favorable terms, but at the same time granting a repurchase option to the Company in case they intended to resell or otherwise dispose of the shares or in the event of termination of their employment. Thus, all the shares acquired by Arthur were subject to the repurchase option under which the Company was entitled for a period of 30 days after Arthur's death to buy them back at book value.[1]

Shortly after Arthur's death, on June 4, 1970, the Company duly exercised its option right and, by an agreement entered into on August 27, 1970, it repurchased 75 percent of the shares owned by Arthur while permitting appellant to retain 25 percent of the shares. The agreement of the parties was thereafter executed as follows: On October 27, 1970, the Company forwarded its check for $76,641.75 to appellant, and on February 3, 1971, it tendered the balance due upon the purchase of the shares and in return appellant transferred 8,471 shares to the Company.

While it is unarguable that, at the time of Arthur's death, the exercise of the option and the implementation of the terms of the repurchase agreement, the Company was still a closely held corporation, appellant seeks to make her case on the fact that beginning in October 1969 the Company engaged in consideration and discussions about possible public financing of the Company. Thus, on October 23, 1969, the Company's executive committee resolved that *in the event* the Com-

---

[1] In illustration, we cite the pertinent part of one of the stock purchase option agreements: "FOR VALUE RECEIVED, I hereby agree with LEVI STRAUSS & CO., hereinafter referred to as the Company, as follows:

"1. *In the event that for any reason I should cease to be employed by the Company* or a subsidiary of the Company, *or in the event of my death, the Company has the option to purchase any or all shares* of the capital stock of the Company then owned by me, whether now owned by me or hereafter acquired, *at the price and upon the terms hereinafter set forth.*

"2.. . . . . . . . . . . . . . .

"The option herein granted to the Company may be exercised within the following periods of time after the occurrence of the event entitling it to exercise the option: . . .

"(c) *In the event of my death, the option may be exercised at any time after my death but not later than thirty (30) days* after receipt by the Company of written notification from my personal representative or his attorney, of the appointment and qualification of such personal representative.

"Notice of exercise of such option shall be given in writing and mailed to me or, in the event of my death, to my personal representative if the Company shall theretofore have received written evidence of such representative's appointment, otherwise to my surviving spouse, if any, otherwise to any relative of mine known to the Company . . . . *In the event of the exercise of said option, the price per share to be paid for said shares shall be a sum equivalent to the 'computed book value'* thereof as of the 'valuation date' . . ." (italics added).

pany's stock should be publicly traded, the repurchase options would be eliminated or modified so that no employee would be required to sell his stock to the Company at less than the prevailing market price. All the stockholders were advised of this resolution by a letter dated November 3, 1969. In May 1970 the Company commenced concrete discussions with its investment bankers regarding the possibility of a public offering. These discussions culminated on October 19, 1970, when the full board of the Company approved the public offering. At the same meeting the board of directors declared a conditional moratorium on the exercise of the repurchase options. The Company filed its registration statement with the Securities and Exchange Commission on January 21, 1971. The public offering was in fact consummated, and on March 3, 1971, the public trading of the Company's stock began. At the same time the repurchase options were extinguished.

The public trading of the Company's stock proved to be highly successful. The offering price published in the prospectus was $47 per share, and the initial sales price exceeded $50 per share and remained above the $50 level through April 1971. Although appellant gained a substantial profit on reselling the shares to the Company at book value,[2] she instituted this action based upon allegations of fraud to rescind the repurchase option agreement, and to recover $713,000 compensatory damages and $500,000 punitive damages. In the summary judgment procedure initiated by respondent in the court below appellant abandoned the theory of fraud and instead claimed that she was entitled to rescission on the ground that the Company allegedly waived and released its right to exercise the option.

On appeal, appellant once again changes her theory of recovery.[3] While still maintaining that the October 23, 1969, resolution of the board of directors should be interpreted as a waiver or release of the option right of the Company, appellant advances the new argument that the summary judgment should be reversed primarily for the reason that the repurchase option in issue is invalid and ineffective. For the reasons

---

[2]The book value at which the Company repurchased the shares was $16.16 per share. The total exercise price was $182,527.20, nearly three times the original acquisition cost of $64,827.

[3]Although as a general rule a party is not allowed to change his theory of recovery on appeal, such change is permitted where, as here, a question of law is presented on the facts appearing in the record (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; *Amer. Auto. Ins. Co.* v. *Seaboard Surety Co.* (1957) 155 Cal.App.2d 192, 200 [318 P.2d 84]).

which follow we are unable to accept appellant's contentions and affirm the judgment.

■  *Validity of Repurchase Option:*  It has been well established both in California and elsewhere that while a corporate by-law may not place an unreasonably restrictive curtailment on the right of alienation, nor may it otherwise unreasonably deprive a shareholder of substantial rights, a by-law reserving a right of first refusal in other shareholders or in the corporation does not violate either of those prohibitions (*Tu-Vu Drive-In Corp.* v. *Ashkins* (1964) 61 Cal.2d 283, 286 [38 Cal.Rptr. 348, 391 P.2d 828]; see also *Vannucci* v. *Pedrini* (1932) 217 Cal. 138 [17 P.2d 706]; *Groves* v. *Prickett* (9th Cir. 1970) 420 F.2d 1119; *Ryan* v. *J. Walter Thompson Company* (1971) 322 F.Supp. 307; O'Neal, *Restrictions on Transfer of Stock in Closely Held Corporations: Planning and Drafting* (1952) 65 Harv.L.Rev. 773, 777). Accordingly, the courts have uniformly upheld and enforced first option provisions in corporate charters or by-laws whereby the shareholder is required to afford the corporation, his fellow-shareholders, or both, an opportunity to buy before he is free to offer his stock to outsiders (*Allen* v. *Biltmore Tissue Corporation* (1957) 2 N.Y.2d 534 [141 N.E.2d 812, 815]; *Cicero Industrial Development Corp.* v. *Roberts* (1970) 63 Misc.2d 565 [312 N.Y.S.2d 893, 899]).

The policy reasons underpinning the restriction of alienation of corporate assets in closely held corporations are manifold. Stock repurchase agreements, which merely delay a transfer of corporate shares rather than forbid it, serve a variety of purposes. They are an important device available to the shareholders who seek to protect their interest in the value of the corporation, and assure that upon the death or withdrawal of a participant the remaining shareholders will be able to control the corporation by preservation of veto power and by exclusion of competitors who might be desirous of disrupting the successful operation of the corporation (*Ryan* v. *J. Walter Thompson Company, supra,* at pp. 312-313; 7 Cavitch, Business Organizations (1971), § 148.02, pp. 925-926). As our Supreme Court succinctly stated in *Tu-Vu Drive-In Corp.* v. *Ashkins, supra,* at page 287: "*Bylaws restricting transfer in closed corporations are frequently essential to a successful enterprise;* they perform an important function in *precluding unwanted intrusions by outsiders;* they preserve the integrity of the functioning entity. Such bylaws are '*necessary for the protection of the corporation and its stockholders against rivals in business* or others who might purchase its shares for the purpose of acquiring information which might thereafter be used against the interests of the company. . . .' " (Italics added.)

At the same time stock repurchase agreements also serve the interests of the individual participants who are under a duty to resell their shares to the company at a fixed rate. It is a matter of common knowledge that in most instances there is no easily ascertainable market value for the shares of closely·held corporations. As a consequence, the various formulae set for determining the option price (e.g., book or appraisal value, par value) provide the participant or his heir an *assured market at a fixed price* for the stock in the event of death, retirement or other termination of interest in the corporation (*Allen* v. *Biltmore Tissue Corporation, supra,* at p. 817). As has been aptly noted, "If a repurchase plan were not in effect, the widow might find it impossible to sell her shares in the open market, and thus might be forced to sell to the surviving shareholders at an unreasonably low price, if they would purchase her stock at all." (*Close Corporation Stock Repurchase Agreements,* 11 Case W.Res.L.Rev. 278, 279; see also 7 Cavitch, Business Organizations, *supra,* at p. 927, fn. 6.)

Notwithstanding the foregoing established law, appellant advances the novel argument that we should differentiate between stock repurchase agreements contained in corporate charters or bylaws which bind all the shareholders, and the first refusal options which are included in individual contracts and binding only on the employees who intend to buy corporate shares. Appellant insists that while the stock repurchase agreements may be upheld where they have been freely entered into among shareholders possessing equal bargaining power, the employee first refusal options should be invalidated because they are lacking in mutuality, constitute so-called adhesion contracts which are imposed upon employees by the employer possessing superior bargaining power and because they are the result of indirect coercion. We profoundly disagree with appellant and reject her unfounded contentions.

Preliminarily, it must be pointed out that the suggested differentiation between the two types of repurchase agreements is entirely artificial and lacks any support in law or reason. ■ By definition, "A stock repurchase agreement is a contract between a corporation and a shareholder under which the *corporation either agrees to buy, or is granted the option to buy,* all or part of the·shares owned by the shareholder, and the shareholder agrees to sell his shares to the corporation, *absolutely or upon the exercise of its option.*" (7 Cavitch, Business Organizations, *supra,* § 148.01, at p. 922; italics added.) It is thus clear that stock repurchase agreements, as a matter of definition, may also include first refusal

options to be exercised by the corporation upon the occurrence of specified events, such as the death of the stockholder or the severance of his connection with the corporation.

In addition, and, contrary to appellant's assertion, an individual option contract entered into between the corporation and a would-be shareholder has a greater binding force than a charter or by-law provision which has been enacted without his consent or his knowledge. This proposition has been spelled out in *Vannucci* v. *Pedrini, supra,* at page 144, where the court stated that " ' "*What may be bad as a by-law* against common right *may be good as a contract,* since a man may part with a common right voluntarily, of which it would be impolitic and unjust to deprive him by a by-law passed without his assent, or perhaps knowledge . . ." ' " (italics added), and is in accord with other cases which underline that the first option provisions are in the nature of a contract between the corporation and its stockholders and, as such, binding upon them (*Allen* v. *Biltmore Tissue Corporation, supra,* at p. 815; *Hassel* v. *Pohle* (1925) 214 App.Div. 654 [212 N.Y.S. 561, 565]). We are unable to attach any legal importance to the circumstance that the first refusal options are entered into between the corporation and its employees as prospective shareholders and are binding upon them, but not on the rest of the shareholders. It is elementary that within the bounds of the law the corporation is free to contract with whomever it intends to, and the validity of the contract does not depend on the status, or the number, of the contracting parties.

Having determined the validity of repurchase options generally, we now turn to the specific theories of attack advanced by appellant against the repurchase option in question.

### (A) *Lack of Mutuality*

As far as the issue of lack of mutuality goes, we point out that an option, by definition, is a *unilateral contract* which binds only the optionor but does not impose upon the optionee any obligation to exercise the option and thereby to enter into a bilateral agreement (*Auslen* v. *Johnson* (1953) 118 Cal.App.2d 319, 321 [257 P.2d 664]; 1 Witkin, Summary of Cal. Law (1973) § 127, pp. 125-126). Hence, mutuality is neither required nor is it an element of the option contract.

## (B) *Contract of Adhesion*

■ Turning to appellant's contention that the stock repurchase option at bench is a so-called contract of adhesion, we first note that the term signifies a standardized contract which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it. This type of contract is condemned by the courts because it is not the result of freedom or equality of bargaining (*Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781]). However, in determining whether an individual contract may be classified as a contract of adhesion, the seminal test is whether the stronger party has disappointed the reasonable expectations of the other party (*Hays* v. *Pacific Indem. Group* (1970) 8 Cal.App.3d 158, 163, 165 [86 Cal.Rptr. 815]; Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract* (1943) 43 Colum.L.Rev. 629, 637). ■ When viewed under this test, it clearly appears that Arthur voluntarily participated in the Company's stock option plan which was highly beneficial to him, and that upon repurchase of the shares his widow did get the enhanced book value, the bargained for consideration. It bears special emphasis that at the time of contracting, the Company's shares were not in public trade, nor were they contemplated to be sold publicly. As a consequence, the possibility of the public trade with the attendant higher prices was not, and could not have been, contemplated by the parties at the time they entered into the contract.

■ It is blackletter law that whether a contract is fair or works unconscionable hardship is determined with reference to the time when the contract was made and cannot be resolved by hindsight by considering circumstances of which the contracting parties were unaware (*In re Estate of Brown* (Ill.App. 1970) 264 N.E.2d 287, 291). All this leads to the conclusion that Arthur's reasonable contractual expectations were not frustrated and therefore the option contract at hand fails to qualify as an adhesion contract.

■ Second, appellant's contention is meritless for the further reason that despite the fact that *contracts of adhesion* are the product of mass production and afford the party to whom they are tendered little, if any, room in which to bargain, they *are perfectly valid and, in the absence of ambiguity, are enforced according to their terms* (*Schmidt* v. *Pacific Mut. Life Ins. Co.* (1969) 268 Cal.App.2d 735, 737 [74 Cal.Rptr. 367]; *Neal* v.

*State Farm Ins. Cos., supra).* ■ Appellant has failed to show any uncertainty in the terms of the option contract and, indeed, its provisions would defy any claim of ambiguity. Hence, the enforceability of the option contract would be unaffected even if classified as a contract of adhesion.

## (C) *Coercion*

Appellant's charge that the option agreement at issue should be set aside on equitable grounds because it resulted from a subtle, indirect coercion by which only the Company was to gain, is not only legally untenable, but amounts to a distortion of the facts and circumstances attending the employee stock purchase plan project.

■ To begin with, it must be pointed out that under well settled principles a contract entered into by reason of fraud, duress or economic compulsion may be rescinded by the injured party. However, it is axiomatic that in such an instance the *entitled party must rescind the entire contract and may not retain the rights under it* which he deems desirable *and repudiate the remainder (Simmons* v. *Cal. Institute of Technology* (1949) 34 Cal.2d 264, 275 [209 P.2d 581]). ■ While this latter rule does not apply to a contract which is severable, where there is a showing that it was the intention of the parties to treat the agreement as an entire contract, and where it appears that their engagements would not have been entered into except upon the clear understanding that the full object of the contract should be performed, the contract is not divisible (*Stern* v. *Sunset Road Oil Co.* (1920) 47 Cal.App. 334, 340 [190 P. 651]; *Heyman* v. *Kline* (Conn. 1970) 344 F.Supp. 1088, 1099).

The stock repurchase agreement at bench unequivocally indicates that the sale of the corporate shares to Arthur was explicitly conditioned on the right that upon a certain contingency (e.g., death, termination of employment) the Company had the option to repurchase the shares at a fixed value. This, of course, compels the conclusion that the repurchase agreement at hand is indivisible within the meaning of the law, and that appellant would be entitled, if at all, to rescind the whole contract by returning the shares at the original purchase price, but would not be permitted to reject the obligations while keeping the benefits thereunder.

But the foregoing considerations aside, it cannot be seriously disputed that, far from being the product of coercion, imposition or economic duress, subtle or otherwise, stock purchase agreements by their very

nature constitute a *substantial fringe benefit* whereby employees are accorded the *privilege of buying corporate assets on highly favorable terms* and thereby are given a financial incentive and economic interest in the success of the enterprise. As a leading author put it, "a typical key employee *incentive device* is the stock purchase plan under which employees are enabled to purchase the corporation's stock at *'bargain'* prices." (7 Cavitch, Business Organizations, *supra,* § 148.02, at p. 925.)

■ The circumstances of the concrete case before us well underline the aforestated proposition. The preamble of the option contract underscores that the agreement serves the purpose of "granting an *incentive to* and by encouraging *key employees* to acquire stock ownership in the Company . . . thus providing them with a more direct interest in the Company's welfare and assuring a closer identification of their interests with those of the Company. . ." (italics added). A closer analysis of the stock purchase agreement provides additional proof how beneficial its terms were to Arthur. Thus, the record demonstrates that a portion of the shares was given to Arthur free, in the form of bonuses. The balance were purchased by Arthur largely with money borrowed from the Company, and the prices for the shares were set so low that even when computed at book value they yielded almost a triple profit to appellant who gained well over $100,000 on Arthur's original $64,827 investment. In this situation appellant's unsupported contention that the stock purchase option was the result of some sort of coercion or economic duress by which only the Company stood to gain ("heads, the company wins—tails, the employee loses") must be categorically rejected.

■ *Waiver and Release:* Appellant's insistence that in the case at bench relief should be granted because the October 23, 1969, resolution of the executive committee and the November 3, 1969, letter issued pursuant thereto[4] constituted a valid waiver or release of the option

---

[4]The pertinent part of the October 23, 1969, resolution reads as follows:

"RESOLVED: that the Executive Committee recognizes that should the Company's stock be publicly traded, it would be unfair for the Company to retain the option to purchase Company stock at a price lower than the market price of such stock.

"RESOLVED FURTHER that the Executive Committee hereby establishes as a matter of record the principle that *should the Company's stock be publicly traded, all repurchase options* held by the Company on Company stock, whether owned by employees, employee-benefit trusts, or others, either *be eliminated* or modified *so that no stockholder shall be required to sell his stock to the Company at a price less than the prevailing market price.*

"RESOLVED FURTHER that the President or the Executive Vice President of the Company is authorized to notify stockholders as to the principle established at this

provisions of the stock purchase agreement is not meritorious either. As appears below, the language of both the board resolution and the letter issued to the stockholders makes the public trading of the Company's stock a condition precedent to the effectiveness of the waiver or release. What we are dealing with here is a conditional waiver or release where the condition never materialized because Arthur had died, and the agreement between appellant and the Company had been perfected, long before the public trading of the Company's stock began on March 3, 1971. It is, of course, well settled that the traditional rules of contractual interpretation are applicable to the construction of documents containing a waiver or release. Accordingly, where, as in the case at bench, the language of a contract is clear and explicit and reduced to writing, the language of the contract governs its interpretation, and the intention of the parties must be ascertained from the writing alone. (Civ. Code, §§ 1639, 1640; *Crow* v. *P.E.G. Construction Co., Inc.* (1957) 156 Cal.App.2d 271, 277 [319 P.2d 47]; *Hofland* v. *Gustafson* (1955) 132 Cal.App.2d Supp. 907, 909 [282 P.2d 1039]; see also: Rest., Contracts, § 404, subd. (1), p. 761; 5A Corbin on Contracts (1964) § 1239, p. 560 et seq.).

Appellant's reference to the October 19, 1970, resolution by which the board of directors declared a moratorium on the exercise of the repurchase options before the March 3, 1971, public trading, is of no support to her position. Rather than making the October 23, 1969 resolution vague or uncertain, the October 19, 1970, resolution once again expressed in unequivocal terms that the commencement date for the nonexercise of the option was *October 19, 1970,* not October 23, 1969, as appellant suggests, and the exercise of the option would be rescinded only with regard to those employees whose employment, unlike Arthur's, terminated subsequent to October 19, 1970.[5] This latter resolution in all

---

meeting, regarding repurchase options." (Italics added.)

The letter sent by the Company's president to the shareholders on November 3, 1969, sets out in part: "*If the time comes that your Company's stock is publicly traded, resale restrictions on your stock . . . will be eliminated* or appropriately modified so that holders of Levi Strauss & Co. stock will not be required to dispose of their stock at a price less than market value." (Italics added.)

[5]The relevant provisions of the October 19, 1970, resolution read as follows:

"RESOLVED: That the policy of the Company with respect to the exercise of repurchase options on Company stock is hereby declared to be as follows: . . .

"(2) *Commencing October 19, 1970,* the date of the adoption of this resolution, and continuing until otherwise directed by the Board of Directors or the Executive Committee of the Company, *no repurchase options shall be exercised on stock of an employee whose employment is being terminated by reason of death* or otherwise, provided that, in any case where the Company's option will lapse unless exercised within the specified period of time, the Company receives from the stockholder or his estate an

practical effect serves but an addendum to dispel any doubt that under neither of the Company's resolutions was Arthur a beneficiary to whom the release or waiver of the option should apply.

Finally, we observe that reduced to its simplest terms appellant's position is that this court should rewrite the option contract so that it provide for the repurchase of corporate shares at the market price rather than the agreed upon book value of the shares. This we cannot do. While we concede that the enforcement of a fixed cut-off date frequently produces harsh results (cf. *Ryan* v. *J. Walter Thompson Company, supra,* at p. 312), the overwhelming weight of authority is to the effect that the validity of restriction on transfer does not rest on any abstract notion of intrinsic fairness of price. To be invalid more than mere disparity between the option price and the current value of the stock must be shown. Since the determination of the price for repurchase is a contractual matter agreed upon by the parties, the court's scope of inquiry is limited to testing the reasonableness of the price formula. Under an unbroken line of cases book value prices of repurchased corporate shares have consistently been approved by the courts (*Cicero Industrial Development Corp.* v. *Roberts, supra,* at p. 899; *Doss* v. *Yingling* (Ind.App. 1930) 172 N.E. 801, 803; *Allen* v. *Biltmore Tissue Corporation, supra* at p. 816; *Claire* v. *Wigdor* (1965) 24 App.Div.2d 992 [266 N.Y.S.2d 6]).

As has been pronounced time and again, the courts can have no concern with the wisdom or folly of a contract, made for a consideration and without fraud where the parties are competent to contract and enter into the same fairly and understandingly. The mere fact that the value of the property has increased or diminished since the contract was concluded will not warrant a refusal to carry out its terms in the absence of circumstances indicating fraud or bad faith (*In re Estate of Brown, supra; In re Frayser's Estate* (1948) 401 Ill. 364 [82 N.E.2d 633, 637]). The record at bench displays no circumstance whatever indicating any such conduct on the part of the Company. On the contrary, the uncontroverted record discloses an admirable example of a progressive and benefi-

---

appropriate extension of time within which the Company may exercise its option.

"(3) *In the event that the Company,* prior to October 19, 1970, *has exercised an option to purchase the stock of an employee whose employment is being terminated subsequent to October 19, 1970, such exercise shall be rescinded* and such option shall not thereafter be exercised except as provided in Item (2) of this resolution." (Italics added.)

cent employer entitled to survive the attempted legal bite of its feeding hand.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 20, 1975.