Alton Banking & Trust Company, an Illinois Corporation, Trustee for the Estate of Herman F. Luer, Deceased, and Alton Banking & Trust Company, of Alton, Illinois, Administrator with Will Annexed, of the Estate of Carl A. Luer, Deceased, Plaintiffs-Appellants, v. Minnie Luer, Dorothy L. Harms, as Trustees Under the Will of William J. Luer, Deceased, Minnie Luer, Dorothy L. Harms, G. G. Mihill and David L. Saylor, II, Defendants-Appellees.

Gen. No. 67–114.

Fifth District.

October 25, 1968.

O'Neill & O'Neill, of Alton, for appellants.

Jack McDonald, McDonald & Strickland, of Carrollton, and John T. Roach, of Alton, for appellees.

EBERSPACHER, P. J.

This is a chancery case brought in the Circuit Court of Madison County seeking to have certain notes and mortgages executed by a corporation in favor of the defendants set aside, and plaintiffs be awarded a first and prior lien against all assets which secured such notes and mortgages. The court entered judgment denying the relief sought by the plaintiffs and this appeal was taken.

The relevant facts as may be gleaned from the testimony, exhibits and stipulations are as follows:

On January 3, 1944, Luer Bros. Packing & Ice Co., an Illinois Corporation, had authorized capital of Five Hundred Twenty Five Thousand Dollars ($525,000) consisting of 2,100 shares of seven percent (7%) cumulative preferred stock and 3,150 shares of common stock, each having a par value of One Hundred Dollars ($100). The stock was owned in practically three (3) equal parts by three brothers: William J. Luer, Carl Luer, and Herman F. Luer. On January 3, 1944, Herman F. Luer and Carl A. Luer sold all of the shares of preferred and common stock of the corporation, which they owned, to the corporation, and in consideration the corporation agreed to pay the sum of Three Hundred Forty Thousand Two Hundred and No/100 Dollars ($340,200), as follows: Forty-nine Thousand Five Hundred and No/100 ($49,500) was paid in cash on that date, and, further, the corporation delivered to Carl and Herman F. Luer a series of seventeen (17) notes, executed by the corporation, numbered 1 through 17, aggregating Two Hundred Ninety Thousand Seven Hundred and No/100 Dollars ($290,700), one of such series being payable to the order of Herman F. Luer and the other to the order of Carl A. Luer, each note in each series being dated January 3, 1944, being for the sum of Eight Thousand Five Hundred Fifty and No/100 Dollars ($8,550), and bearing interest

at the rate of three percent (3%) per annum, payable semiannually, first note in each series being numbered one (1), maturing January 3, 1948, and the balance of the notes in each series maturing in numerical order, one on January 3 of each year thereafter until 1964, when the last of the notes matured.

Following the transaction full ownership and control of the corporation was then in the third brother, William J. Luer.

Note numbered 1 in each series was paid in 1945. Two more notes in each series, being notes numbered 2 and 3, were paid in 1946. After the death of William J. Luer which occurred in 1946, the corporation paid three more notes in each series, being notes numbered 4, 5, and 6, during the year of 1947, two notes in each series, being notes numbered 7 and 8, during the year 1948, and two more notes in each series, being notes numbered 9 and 10, maturing January 3, 1956 and January 3, 1957, during the year 1953. Subsequent to the transaction complained of, the corporation paid note numbered 11 in each series, maturing January 3, 1958, and paid the interest accruing upon the balance of said notes up to January 3, 1960.

Herman F. Luer died on August 20, 1952, naming the plaintiff, Alton Banking & Trust Co. as Trustee of his estate.

Carl A. Luer died on November 19, 1965, a resident of the State of Florida. The plaintiff, Alton Banking & Trust Co. was appointed Administrator with Will annexed for the Estate of Carl A. Luer.

During the later part of 1957 and for some time prior thereto the corporation was authorized to issue 2,500 shares of stock consisting of 750 shares of seven percent (7%) cumulative preferred stock of par value of $100 per share and 1,750 shares of common stock of par value of $100 per share, of which 750 shares of the 7% cumulative preferred stock and 1,098 shares of the common stock were actually issued and outstanding. The defend-

ants were the owners of all the outstanding shares as follows:

| Owner | Preferred Stock | Common Stock |
|---|---|---|
| Minnie Luer and Dorothy L. Harms, as Trustees Under the Will of William J. Luer | 64 | 896 |
| Minnie Luer, Individually | 410 | 26 |
| Dorothy L. Harms, Individually | 263 | 16 |
| David L. Saylor, II | 13 | 145 |
| G. G. Mihill | | 15 |
| | 750 | 1,098 |

The evidence further revealed that on December 27, 1956, a conference was held at the Alton plant between George H. Suelthaus, an attorney and the Secretary of the corporation at the time, Dorothy Luer Saylor, the President, G. G. Mihill, the Vice-president, and Norman Brammell, a business consultant specializing in the packing house industry, who had been employed to manage and supervise the business; that as a result of the conference Mr. Suelthaus proceeded to familiarize himself with all of the facets of the operation; that he found that the corporation had a loss pattern for the past year and one-half; that its cash position had been weakened by the expenditure of some $100,000 during the past year for modernization of its sausage unit; that economies would have to be effected, including the termination of Mr. Brammell's services due to the expense involved; and that the labor situation at the plant was the major reason for the corporation's inability to operate on a profitable basis.

Mr. Suelthaus testified that on February 11, 1957, the corporation terminated the services of Mr. Brammell;

21

that at about the same time, the Office Manager, who had been employed through Mr. Brammell, tendered his resignation; that a replacement for the Office Manager was found through Peat, Marwick, Mitchell & Co., the corporation's auditors, in the person of Mr. Paul Branding, a certified public accountant; that after interviewing a number of applicants for the office of Plant Manager, Mr. Grover Foster, who had been employed in the packing house industry for many years, was selected as the best qualified man available for the office; that despite the changes in management and numerous economies effected, the corporation continued to lose money; that at a special meeting of the Board of Directors held on September 26, 1957, it was decided to employ the law firm of Moller & Talent, of St. Louis, Missouri, to negotiate with the labor union representing the employees which had previously given notice that its contract would expire October 30, 1957, and that it would expect higher wages and greater fringe benefits; that these attorneys reported that the union was not willing to make any concessions and about October 15, 1957, it was decided to stop killing, to liquidate the perishable inventory and to make efforts to obtain a purchaser of the business by means of the purchase of all the outstanding stock; and that on November 1, 1957, the plant was put strictly on a standby basis, with Mr. Branding being put in charge of the plant and nothing but the sales force and such employees as were required to maintain the cooling system and the other essential equipment being retained on the payroll.

Mr. Suelthaus also testified that on or about November 9, 1957, Mr. Harry Munson, former Officer Manager, contacted him advising that he and his associates, Gerald Moss and William Drake, were interested in purchasing the plant and requested that he get in touch with their attorney, Mr. Ralph Curry, of St. Louis, Missouri; that he and Mr. Curry then negotiated the sale of the stock;

that he first offered to sell the stock at book value but his offer was rejected; that Mr. Curry advised him that his clients would not be interested unless a plan could be worked out which would enable the corporation to acquire all the outstanding preferred and common stock and provide a minimum of $100,000 in new cash for operating capital; and that their subsequent negotiations led up to the agreement of November 24, 1957, which was drafted by them jointly in his office.

This agreement, with certain minor modifications agreed to prior to December 6, 1957, in addition to the provisions contained therein for the warranties and conditions which would normally be expected under like circumstances, provided that in consideration of the Second Parties, Harry Munson, Gerald Moss, and William Drake, subscribing or presenting subscriptions of 1500 shares of stock of the corporation at $100 per share, of which $100,000 was to be paid in cash and the balance in 30 days, First Parties, the defendants herein, agreed to sell the corporation (1) the 750 shares of preferred stock which they owned at $100 per share, of which $50,000 was to be paid in cash and the balance of $25,000 was to be evidenced by note secured by first deed of trust on the warehouse building, and (2) the 1098 shares of common stock which they owned for $209,484.01, or approximately $190.79 per share, all to be evidenced by five promissory notes of the corporation, secured by first deed of trust on the principal plant building and chattel mortgage on the machinery and equipment. Second Parties were to have until December 6, 1957, in which to elect to consummate the agreement. The agreement, as so modified, was consummated at a special meeting of stockholders and directors held on December 6, 1957. At the special meeting of December 6, 1957, Munson, Moss, and Drake presented subscriptions for the 1500 shares of the corporation's stock at a price of $150,000, of which they paid $100,000 in cash and the balance within the

specified 30 days, and that in due time, the defendants sold the corporation the 750 shares of preferred stock which they owned for $75,000, of which $50,000 was paid in cash and the balance of $25,000 was evidenced by the corporation's promissory note, secured by first deed of trust on the warehouse building, and the 1098 shares of common stock which they owned for $209,484.01, all evidenced by five promissory notes of the corporation, secured by first deed of trust on the principal plant building and chattel mortgage on the machinery and equipment.

Attached to the said agreement was a financial statement containing a balance sheet of the corporation as of November 2, 1957, a copy of which was offered in evidence by plaintiffs as Plaintiffs' Exhibit 1–A. The witness, Paul Branding, testified that he was a certified public accountant; that he had been employed by the corporation as office manager and comptroller, that his duties as comptroller were to maintain all books of original entry, keep the general ledger, and be responsible for payrolls, payables, purchases, etc.; that in carrying out such duties he had become familiar with the books and records of the corporation; that he had personally prepared this exhibit; that it truly reflected the financial condition of the corporation as of the date mentioned therein as shown by its books and records; and that said exhibit had been prepared upon the same accounting principles as used previously by the firm of Peat, Marwick, Mitchell & Co. In addition, Mr. Ralph Curry testified that he was both an attorney and an active certified public accountant; that he had made an audit of the books and records of the corporation; that from such audit he had found that the balance sheet of November 2, 1957, truly and correctly reflected the financial condition of the corporation as of that date. This exhibit shows that as of November 2, 1957, the corporation had $333,943.57 in current assets, including $206,-

24

120.42 in cash on hand and in banks, as against total liabilities of $258,766.64, including the long-term notes of plaintiffs, and had net assets of $472,041.78, including an earned surplus of $287,241.28.

The witness Ralph Curry also testified that he had personally prepared the balance sheet of December 6, 1957, offered in evidence by plaintiffs as Plaintiffs' Exhibit 13; that such balance sheet was prepared in the ordinary course of business and truly and correctly reflected the financial condition of the corporation on that date as shown by its books and records after giving effect to the stock purchased by the new stockholder group on December 6, 1957; and that on that date the corporation had current assets, including investments and prepaid expenses, of $329,619.88, of which $225,335.-54 was cash on hand and on deposit, as against current liabilities of $65,166.85, including $17,100 to cover plaintiffs' two notes due January 3, 1958, and $16,180.65 to cover local taxes, and had net assets of $311,268.87 including an earned surplus of $161,268.87.

On the 28th day of April, 1960, Luer Bros. Packing & Ice Company, an Illinois corporation, was duly adjudged a voluntary bankrupt. Thereafter, plaintiffs filed their respective claims as general creditors in the bankruptcy proceedings, premised on the aforesaid promissory notes, and on final distribution made December 4, 1961, received individual payments of $25,375.31, representing 49.46% of their respective claims. This left a balance due on each series of notes of $25,924.69, or a total of $51,849.28, with interest from January 3, 1960.

After hearing the evidence and considering the briefs filed by the respective parties the trial court entered an Order which stated in part:

". . .

"That as shown in the exhibits introduced by plaintiffs, being Plaintiffs' Exhibits 1–A and 3 (sic),

the corporation was solvent to the extent that it could acquire its own shares under the conditions as set forth in Chapter 32, Section 157.6, Illinois Revised Statutes, 1957. The aforesaid exhibits disclosed an earned surplus of $287,241.78, and net assets of the company of $472,041.78. These amounts exceed the sum paid by the corporation for the purchase of defendants' shares of stock;

"That although each party urges equity and the concept of the clean hands doctrine, the one against the other, the plaintiffs in regard to the manner of the operation of the business by the defendants, the payment of dividends and salaries, and so forth, and the defendants in the manner in which the corporation purchased the stock held by Herman F. Luer and Carl A. Luer in 1944, this need not be considered by the Court inasmuch as the Court finds that the defendants have in all respects complied with the statute and have committed no fraud, actual or constructive, upon the plaintiffs.

"The end result of the sale of the defendants' interest in the Luer Bros. Packing & Ice Company was their having security for the payment of the stock formerly owned by them and the plaintiffs remained in an unsecured creditor status, that is, the same status which existed on January 3, 1944, when Herman F. Luer and Carl A. Luer sold their shares of preferred and common stock to Luer Bros. Packing & Ice Company. . . .

"Accordingly, It is Ordered, Adjudged and Decreed that the relief prayed by the plaintiffs' Complaint be and the same is hereby denied."

In their effort to set aside the notes and mortgages the plaintiff urges here as in the trial court that it is the duty of the majority stockholders to protect the minority stockholders and also the creditors of a corporation, and

26

that a corporation has the responsibility in the disposition of its assets to protect parties with valid claims. The plaintiff further argues that the directors of a corporation are liable to the creditors of the corporation for the distribution of corporate assets while the corporation is insolvent or for the acts that reduce the net assets of a corporation below its stated capital. In this regard the plaintiff has cited for our consideration the cases of Robb v. Eastgate Hotel, 347 Ill App 261, 106 NE2d 848 (1952); Pepper v. Letton, 308 US 295, 84 L Ed 281 (1939).

As general principles of law we have no quarrel with the cases cited by the plaintiff. However, in our opinion their applicability is misplaced. In the present case it was not the majority of the stockholders but all of the stockholders acting in concert. Likewise, contrary to the assertion that the corporation was insolvent at the time of the transaction the evidence is uncontradicted that the net assets of the corporation immediately prior and after the transaction were $472,041.78 and $311,268.87, respectively. The net assets were not reduced below the stated capital by the transaction.

The power and restriction of a corporation to acquire its own shares is provided for in section 157.6 of The Business Corporation Act, c 32, § 157.6, Ill Rev Stats 1957. The pertinent parts of this section provide:

> "Power of corporation to acquire its own shares. A corporation shall have power to purchase, take, receive or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares, provided that it shall not purchase, either directly or indirectly, its own shares when its net assets are less than the sum of its stated capital, its paid-in surplus, any surplus arising from unrealized appreciation in value or revaluation of its assets and any surplus arising from surrender to the corpora-

tion of any of its shares or when by so doing its net assets would be reduced below such sum.

". . .

"No purchase of its own shares shall be made at a time when the corporation is insolvent or when such purchase would render the corporation insolvent." As amended by act approved July 9, 1957.

■ This section in general has been interpreted to provide that the purchase of a corporation's own shares may be made out of earned surplus and prohibits a corporation from purchasing its own shares under any circumstances when it is insolvent. Precision Extrusions, Inc. v. Stewart, 36 Ill App2d 30, 183 NE2d 547 (1962).

The plaintiff offered the only evidence in the record as to the earned surplus of the corporation on the date of the transaction. That evidence was that the earned surplus was $287,241.78. The total purchase price for the stock was $284,484.01 and was clearly within the authority of the corporation.

■ The fact that the defendants obtained security in the sale of their shares through the mortgages and deeds of trust does not detract from their position. There is no evidence in the record that the defendants anticipated the eventual bankruptcy of the corporation. In fact, the evidence was that the corporation was operative and solvent prior to and after the transaction. We concur with the finding of the trial court to the effect that the defendants have in all respects complied with the statute and have committed no fraud, actual or constructive, upon the plaintiffs.

Accordingly, the judgment of the Circuit Court of Madison County is affirmed.

Judgment affirmed.

GOLDENHERSH and MORAN, JJ., concur.