In re L & S INDUSTRIES, INC., an Illinois corporation, Debtor.

Gary WILLIAMS, Plaintiff,

v.

L & S INDUSTRIES, INC., Defendant.

Bankruptcy No. 81 B 14558.
Adv. No. 82 A 1620.

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 17, 1986.

Ralph E. Brown, David M. Giangrossi, Mark E. Singer, Walsh, Case, Coale & Brown, Chicago, Ill., for plaintiff.

James W. Hathaway, James W. Hathaway & Associates, Chicago, Ill., for debtor/defendant.

## MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

JACK B. SCHMETTERER, Bankruptcy Judge.

### The Pleadings

Gary Williams ("plaintiff"), secured creditor of L & S Industries, Inc. ("debtor"), filed this Adversary Complaint to Modify the Automatic Stay so as to enforce a note and security agreement he held in debtor's assets.[1] Debtor answered and pleaded with fourteen Affirmative Defenses and/or Counterclaims. This now comes on for ruling on cross motions for Summary Judgment to debtor's thirteenth and fourteenth affirmative defenses. This Court has core jurisdiction to determine issues necessary to resolve stay litigation. Title 28 U.S.C. § 157(b)(2)(G).

The Bankruptcy case was converted from Chapter 11 to Chapter 7 on May 15, 1985. Lawrence Cooper was appointed as Trustee, but has not been joined as a party hereto.

Neither party complied with General Rules 12(e) and 12(f) of this District Court; which would be justification to strike both motions. However, in view of the long delay by the Court in passing on motions briefed in 1984 and still pending when this Court was sworn in mid 1985, the merits of the issues shall be the basis for ruling.

1. The Complaint was filed in May, 1983. Prior to August, 1983, Bankruptcy Rules required that an Adversary Proceeding be instituted to modify the stay.

For reasons set forth below, all motions for summary judgment will be denied.

The underlying dispute in this proceeding is as to the validity of an agreement dated November 20, 1980. Pursuant thereto, plaintiff sold his 50% interest in the debtor corporation to that corporation and to Lawrence Stefan, the other 50% shareholder. As sole remaining shareholder, Stefan purchased approximately 17% of the stock (83,334 shares) and caused debtor to purchase the remaining 83% (416,666 shares). As consideration for the corporate stock redemption, debtor conveyed and assigned to plaintiff certain real estate with a book value of $176,578, a lease on debtor's premises, and a promissory note in the amount of $750,000 payable in three installments of $250,000 each with the first installment due November 20, 1981. Stefan paid $150,000 for the shares which he purchased.

As part of the transaction, debtor (through instruments executed by Lawrence Stefan) executed a security agreement securing payment of the lease and promissory note obligations with debtor's assets. Lawrence Stefan and his wife also executed their personal guaranty of the promissory note. The security agreement executed by debtor was a blanket agreement covering all assets, but specified that it was junior to the current balances on any existing liens as of September 30, 1980. Plaintiff perfected the security interest by filing a financing statement with the Illinois Secretary of State on November 24, 1980 (Exhibit "D" to the Complaint). Debtor filed its petition under Chapter 11 on November 23, 1981. The Bankruptcy Court subsequently found that Lake Shore National Bank has a security interest in debtors' assets in the amount of $470,345.31.

Plaintiff alleges that the promissory note and lease are in default in the amount of $905,586.80. He further alleges that the value of debtor's assets is insufficient to pay both his and Lake Shore National Bank's obligations in full. Debtor denies this allegation and asserts that it is excused from performance of any obligations to plaintiff because of his breach of contract with debtor, and breach of fiduciary duty to debtor, its directors and shareholders. In the thirteenth and fourteenth affirmative defenses debtor pleads that the stock redemption agreement was void and unenforceable under Illinois law as impairing earned surplus and rendering the company insolvent. Plaintiff disputes that and asserts further that debtor is barred by estoppel and *res judicata* from asserting any illegality of contract.

Additional facts of record are discussed below in relevant sections of this opinion.

1. *The re-purchase of stock by a corporation that impairs earned surplus or renders it insolvent is unlawful and unenforceable.*

Both parties have filed Cross Motions for Summary Judgment on debtors' affirmative defenses thirteen and fourteen which allege violations of § 157.6 ("Section 6") of the Illinois Business Corporation Act, ILL. REV.STAT. ch. 32, § 157.6 (Repealed July 1, 1984) (hereinafter the "Act"). Pursuant to Section 6, a corporation may not purchase its own shares if there is insufficient "surplus", or, if the purchase was made while the corporation was insolvent or would render it insolvent.

The pertinent provisions of the Corporation Act then provided in pertinent part:
§ 157.6

"A corporation shall have power to purchase ... its own shares, provided that it shall not purchase, either directly or indirectly, its own shares when its net assets are less than the sum of its stated capital, its paid in surplus, any surplus arising from unrealized appreciation in value or revaluation of its assets and any surplus arising from surrender to the corporation of any of its shares, or when by so doing its net assets would be reduced below such sum.

. . . . .

No purchase of its own shares shall be made at a time when the corporation is

insolvent or when such purchase would render the corporation insolvent.

§ 157.2–11:

"Stated capital" is the amount of capital contribution of the shareholders allocated to stated capital.

§ 157.2–12:

"Paid-in surplus" is the amount of capital contributions which was not allocated to the state capital account.

§ 157.2–15:

"Insolvent means that a corporation is unable to pay its debts as they become due in the usual course of its business."

Debtor has advanced two theories in support of its Motion for Summary Judgment. First, (Thirteenth Defense) under the statute, there was insufficient "surplus" from which it could purchase its own shares. Second, (Fourteenth Defense) the transactions rendered it insolvent at the time of the first installment and forced it into bankruptcy.

2. *Based on the corporation's accounting method used at the time of transaction, the instant corporate stock purchase impaired "earned surplus" in violation of Illinois law then applicable.*

(a) *General Rule*

In support of its "surplus" argument, debtor cites cases which held under law applicable at the time of transaction that an Illinois corporation could only purchase its own shares out of "earned surplus". Debtors' statement of the precedent in that regard is correct. A contract for redemption by a corporation of its shares was simply illegal and not enforceable when, in violation of the Business Corporation Act and public policy at the time, the sale would impair the company's capital and surplus in violation of Section 6 of that Act. *Amer. Heritage Investment v. Ill. Nat'l. Bank*, 68 Ill.App.3d 762, 767, 25 Ill.Dec. 431, 386 N.E.2d 905 (4th Dist., 1979).

Plaintiff argues that because Stefan and the two existing creditors at that time agreed to the transaction, the Court should enforce the contract. *Galler v. Galler*, 32 Ill.2d 16, 203 N.E.2d 577 (1964), is cited for the proposition that in matters concerning closely-held corporations, the courts may enforce agreements when the creditors and minority shareholders will not be harmed. However, in *Galler*, the agreements specifically required that a $500,000 earned surplus had to remain after the payments were made or the agreement would not be operative. *Galler* did not involve issues of capital impairment but rather disputes as to corporate control. The intent of the agreement there was to provide income to survivors of the shareholders, and did not involve, directly or indirectly, the purchase of stock by the corporation.

The court in *American Heritage* indicated that under Section 6 no analysis or determination of whether harm will occur should be ordinarily made by the Court. The statute was found to express a bright line—either there was sufficient earned surplus and the agreement was and remains valid, or there was insufficient earned surplus which automatically made the agreement unenforceable. Under Illinois law, therefore, the holding in *Galler* does not apply to an "earned surplus" question under Section 6.

(b) *"Earned Surplus"*

Though the terminology "earned surplus" was not found in Section 6, statutory language and case law precedent made clear that purchase by a corporation of its own shares could only be made out of retained earnings. Under the Illinois Act, a stock purchase could not be made out of asset appreciation, assets required to pay all creditors, or assets needed to return all capital contributions made by the incorporators and shareholders. Obviously, the only remaining assets available for such purchase were current and prior earnings retained by the corporation. It followed that the "earned surplus" had to equal or exceed the purchase obligation undertaken by the corporation or the excluded assets would have to be utilized. This was the conclusion of the Illinois Appellate Court in *Amer. Heritage Investment, Id.,* 68 Ill.

App.3d at 765–66, 25 Ill.Dec. 431, 386 N.E.2d 905:

> ... [T]he drafters of section 6 intended to require that, subject to exceptions not involved here, a corporation purchase its own shares only out of earned surplus. The section was not drafted to so state, however, because of the difficulty of defining the phrase "earned surplus." Instead the act was drafted to prohibit purchase of such shares when its stated capital and various surplus accounts which were not earned surplus were impaired or when the purchase would impair them. The phrase "earned surplus" was thus defined indirectly by eliminating any other type of surplus as a source of payment for such shares. See 1 Illinois Business Corporation Act Annotated § 6 (3d ed. 1975); Ballantine, A Critical Survey of the Illinois Business Corporation Act, 1 U.Chi.L.Rev. 357 (1934).

Provisions since enacted to replace § 157.6 (ILL.REV.STATS. ch. 32, § 9.05, § 9.10; effective July 1, 1984) now permit a corporation to purchase its own shares out of both capital contributions and unrealized appreciation. The only limitations under current law are that the purchase neither render the corporation insolvent nor decrease "net assets" below zero or the amount required to be distributed to holders of preferred shares upon liquidation. Illinois corporate policy has thereby been modified.

Debtor supports its argument of insufficient "earned surplus" under former law by presenting the affidavit of its General Manager and Controller, John Kennedy, together with copies of financial statements. Based upon the Kennedy affidavit and financial statements, debtor claims that the total purchase price of $926,577 reduced the retained earnings balance of $521,898 to a negative balance of $378,788. If that was so, the transaction impaired earned surplus and was unlawful and unenforceable. The financial statements were based *inter alia* on debtor's use of the accelerated depreciation accounting method for the period in question.

Plaintiff agrees that the purchase had to be made out of "earned surplus" but asserts that in determining "earned surplus", actual market value of the assets must be used. Therefore he argues that depreciation computed for purposes of Section 6 of the Act must equal the actual decline in asset value, not using accelerated depreciation which is a tax concept allowing for a more rapid write-off but which undervalues assets in reality. He argues that because depreciation reduces earnings, the use of a tax-oriented accelerated depreciation deduction which exceeds the actual decline in value understates the available "earned surplus".

Debtor's position on both arguments is that use of any method of depreciation different than that actually used on the company's financial statement was not permissible under the applicable statutory provision. Section 6 of the Act stated that "... any surplus arising from unrealized appreciation in value or revaluation of its assets ..." could not be used by a corporation for purchase of its shares.

The parties do not dispute that with the accelerated depreciation method actually used by debtor at the time of such purchase, earned surplus was inadequate to permit the stock purchase under Section 6. In that regard the Kennedy affidavit and financial statements are uncontradicted. However, if plaintiff's assertion of straight line depreciation method is used retrospectively, the counter-affidavit of Gary Williams submitted by it tends to show that there was sufficient earned surplus to meet the test of Section 6. In that regard the Williams affidavit is likewise uncontradicted.

### (c) *The Depreciation Issue*

There appears to be no reported Illinois cases litigating this depreciation issue under Section 6 of the Act.

It is apparent from the language of Section 6 that actual value (which inherently includes unrealized appreciation) may not be considered in determining whether "an earned surplus" existed at the time of purchase. The asset values used to compute

"net assets" are generally book values, i.e., cost adjusted downward for depreciation or disposition.

The old statute prohibited purchases out of "unrealized appreciation" or "revaluation of assets". Excess value from "unrealized appreciation" arises from a revaluation of the assets by the corporation, and revaluation occurs when the corporation uses someone to reappraise the book value of the assets, as plaintiff seeks to do here. Support for this analysis of the old law is found in the Amended Act which now provides that the corporation must use "reasonable" accounting methods (which presumably could include a reappraisal) or an appraisal. ILL.REV.STAT. ch. 32, § 9.05, § 9.10.

The issue here, then, is whether the accelerated depreciation method actually used by this corporation must be accepted for determining "earned surplus" or whether some other method reflecting true value at time of sale may be judicially determined and applied to the Section 6 analysis. Debtor argues that a present changing of the depreciation method for purposes of a Section 6 analysis of the old stock purchase would result in revaluation of its assets as of the purchase date. It reasons that, because the accelerated depreciation method actually used decreased asset values, change to another depreciation method would increase values and thus revalue property. Plaintiff counters that depreciation reduces gross income and that accelerated depreciation decreases earnings to a greater extent than the actual decline in value of the depreciable assets.

Neither party has presented direct support for its argument, though plaintiff has cited cases not decided under Illinois law for *dicta* that financial statements should not always be accepted at face value because they are vulnerable to manipulation:

"[A]s a matter of accounting theory, depreciation is simply an accounting devise intended to allocate the cost of using an asset to the periods in which that use contributes to revenue by approximating the gradual diminution in value of the asset over time due to age, wear and tear, and obsolescence." *Hawkins v. C.I.R.*, 713 F.2d 347, 351 (8th Cir.1983). "[D]epreciation is a process of estimated allocation which does not take account of fluctuation in valuation through market appreciation." *Fribourg Navigation Co., Inc. v. C.I.R.*, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966).

From both a financial and tax accounting standpoint, when a depreciable asset is purchased the salvage value and estimated useful life are determined. The difference between cost and salvage value is allocated over the period of estimated use and a method for depreciating the asset is elected. The "straight-line" method allocates the cost in excess of salvage value equally over the estimated useful life, while the "accelerated" method allows larger deductions in earlier years. If the asset is retained throughout its estimated useful life, all methods of depreciation reach the same theoretical end result (i.e., salvage value) at the same time. Accelerated methods of depreciation have an obvious tax advantage and also recognize that some assets will decrease in value more rapidly in the early years because of excessive wear, decreasing marketability or potential obsolescence.

One possible purpose of depreciation is to allocate an amount each year equal to the depreciation deduction so that upon disposition funds are available to replace the asset at cost. Theoretically, the funds to replace the asset would not then come from the capital assets of the corporation because that would further reduce asset values, but rather from then current earnings. The U.S. Tax Code recognizes this concept and allows a deduction for depreciation from gross income. Title 26 U.S.C. § 167.

On a financial statement, assets are listed at cost and a corresponding entry is made to deduct the cumulative amount of depreciation to arrive at "Total Fixed Assets". Current and long-term liabilities are then deducted from the fixed asset total to determine "net assets" which is comprised of shareholder equity (capital contributions) and retained earnings. Because sharehold-

er equity remains static, the changes in net assets due to depreciation affect the retained earnings account.

Prior to enactment of the 1954 Internal Revenue Code ("Code"), a taxpayer was allowed a "reasonable" allowance against gross income for wear and tear or obsolescence but the Code did not specify a method for determining the amount of depreciation. The Code enacted § 167(b) and for the first time authorized both straight-line and accelerated methods of depreciation.

During the earlier period of 1913–1954, the generally accepted method of depreciating an asset was the "straight-line" method for uniform deduction over the estimated useful life of the asset. The popularity of that method at the time was due to its simplicity and because use of any other method required establishing its propriety through industry practices, expert testimony or other evidence. B. BITTKER, FEDERAL TAXATION OF INCOME, ESTATE AND GIFTS, Vol. I, ¶ 23.5.1, p. 23–51, (1981).

The authorization in § 167(b) of the 1954 Code to use accelerated depreciation was limited to tax years beginning after December 31, 1954. Though this does not mean that accelerated depreciation methods proven to be "reasonable" were not used in prior years, it does indicate that the accelerated depreciation method was not widely used prior to 1954.

The Illinois Corporation Act which governs this case was enacted in 1933. At that time, the generally accepted method of depreciating an asset was the straight-line method. Did the Illinois legislature consider the possibility that corporations would have the option to choose methods of depreciation which would create different "earned surplus" results depending upon that choice? No legislative history on this point was found or cited. But since no statutory restriction was placed on use of depreciation method, it must be assumed without legislative history to the contrary that none was intended.

Plaintiff's theory has some logical support in the Internal Revenue Code. Upon disposition of depreciable business assets or investment real estate, the depreciation in excess of "straight-line" (i.e., accelerated depreciation) is recovered as ordinary income, whereas amounts deducted under the straight-line method are given preferential capital gains treatment. Title 26 U.S.C. § 1245, § 1250. The Tax Code thereby assumes that a rapid decrease in asset valuation because of accelerated depreciation is generally not an accurate reflection of true diminution in asset value. The subsequent recovery of the excess as ordinary income indicates that Congress views accelerated depreciation as a "Tax Benefit" rather than a return of capital upon disposition.

Some corporations have two accounting systems—one which shows the actual financial strength of the business and another for tax purposes. For example, gross income for tax purposes would exclude income from tax-exempt securities, whereas gross income for financial accounting purposes would include all income. Further, for tax purposes, the "Earnings and Profits" account out of which dividends are paid requires various adjustments that may not be made to "retained earnings" on a financial accounting balance sheet. The point is that a corporation will not use accelerated depreciation on its financial statement when it wants to appear as profitable as possible to its lenders and creditors.

No evidence has been presented here that this debtor had two accounting systems in use at any time. However for purposes of the instant sale one affidavit claims that the parties agreed on an asset appraisal available at the time that disregarded the accelerated depreciation method. The full significance of such agreement, if it was made, must be explored at trial and cannot (for reasons discussed below) be decided on summary judgment motions.

What is apparent at this point is that when accelerated depreciation was used, that decision was made while plaintiff was a 50% owner. He indirectly received the

benefits at that time and can demonstrate no reason why the accelerated depreciation method was then improperly used by the Company. Moreover, to allow reaudit now of corporate books from the date of incorporation or at the time of the sale, or to allow an appraiser now to revalue the depreciated value at time of stock sale, would each be steps not likely to produce reliable data at this late date. Debtor is now in liquidation. Not only would each asset have to be reevaluated and re-depreciated, but income taxes would also have to be recomputed because tax liability would have been greater due to a lower depreciation deduction. That would have decreased earnings, with consequent effects on the corporate solvency picture. Such re-evaluation is contrary to the Section 6 statutory bar on re-evaluation and would be unworkable in practice. There is no authority or historical support for such an analysis of "true" depreciation that would allow retrospective attacks on otherwise valid stock purchases as well as retrospective defenses of unlawful purchases.

■ From the foregoing analysis, this Court concludes as a matter of Illinois law that the method of depreciation actually in use by a corporation purchasing its stock is that on which the Section 6 analysis must ordinarily be made. Therefore, based on the accounting method of depreciation then used, the instant stock purchase would have impaired earned surplus in violation of Illinois law then applicable, and a retrospective re-evaluation and recomputation of depreciation and earnings cannot be permitted.

While debtor's argument on this point may ordinarily be correct, however, that does not dispose of the case or permit allowance of its motion for summary judgment on the Thirteenth Defense.

A significant discussion related to this issue is found in Vol. 1, *Illinois Business Corporation Act Annotated 3rd,* (West Pub. Co.) (1975) at pp. 73–74:

Book Value as a Determinant of Purchase Price

Many agreements for the purchase of shares among shareholders or by a corporation specify the price to be "book" value. If such a method of valuation is chosen, it should be done with an awareness that the book value of a corporation need not bear any relation whatsoever to either the net value of its assets nor to the value of the corporation as manifested by its earning power. The book value relates to historical cost and, particularly if land or real estate is involved, the present fair market value of such assets may be considerably in excess of book. Also, with respect to a corporation in which capital is not an important factor but which is extremely profitable, there may be a great disparity between the book value of the corporation and the value obtained by using a capitalized earnings approach.

Notwithstanding the foregoing, and the possible inequities arising from using book value as the basis for the purchase price, two recent Illinois decisions have expressed a willingness to accept such a basis of valuation if it is agreed upon by the parties, at least where there is no fraud or overreaching involved. See *Gifford v. Rich,* 58 Ill.App.2d 405, 208 N.E.2d 47 (1965) and *In Re Estate of Brown,* 130 Ill.App.2d 514, 264 N.E.2d 287 (1970). In the *Estate of Brown* case, the agreement did provide for the parties substituting an agreed value in lieu of book value, but, as is often the case, no such subsequent agreement was ever reached. The court pointed out that the Illinois courts have consistently held that where a contract has been fairly entered into in good faith, and without fraud, concealment, or overreaching, it may be specifically enforced in spite of subsequent changes in circumstances.

■ It is by no means clear from the record now before the Court whether the parties here agreed to use book value (with the accelerated depreciation method) or an appraisal of actual value as their basis for their stock transaction. For that reason and for other reasons discussed below, the

Complaint and defenses thereto must proceed to trial.

### 3. *Possible insolvency a year after the Stock Purchase does not void the sale.*

■ In its Fourteenth Affirmative Defense, debtor maintains that Section 6 was also violated because the Purchase Agreement rendered the corporation "insolvent". The statute defines insolvency as the corporation being unable to pay its debts as they become due in the usual course of its business.

Debtor's contention is that if payment of the note and interest at some point in the future after stock purchase would prevent the corporation from paying its debts, the agreement can then be invalidated at that future time. Debtor claims that when the first payment of principal and interest ($355,000) was due a year after purchase, it was then unable to pay its debts because of that obligation. It then became "insolvent" a year after the purchase, thus retroactively voiding its stock purchase of a year earlier.

Plaintiff cites debtor's cases for the proposition that the date of the sale agreement is the only relevant date to determine solvency. He also quotes a passage from debtors Third Amended Disclosure Statement in which debtor admits that other factors prevented it from making the first installment payment on the stock purchase. There is at least fact dispute as to whether the stock sale caused debtor to become solvent a year after sale. However, there is no dispute that debtor was solvent at the time of sale.

There is no case law which strictly defines the date that "insolvency" is determined. However, in *Alton Banking & Trust Co. v. Luer,* 101 Ill.App.2d 18, 28, 242 N.E.2d 291 (5th Dist.1968), the court stated:

"The fact that the defendants obtained security in the sale of their shares through the mortgages and deeds of trust does not detract from their position. There is no evidence in the record that the defendants anticipated the eventual bankruptcy of the corporation. In fact, the evidence was that the corporation was operative and solvent prior to and after the transaction."

One can conclude from this quote and the language of the statute that the pertinent date to determine solvency is the date of the transaction.[2] Any insolvency test which extended the date of determination up to the date of final payment would ignore the post-purchase effects of the economy, poor management, and unforeseen events upon the corporation. Also, the thrust of the "public policy" served by Section 6 of the Act is "... to protect the capital structure of a corporation, a cushion for the benefit of creditors *who may exist.*" *Amer. Heritage Investment, supra,* 68 Ill.App.3d at 769, 25 Ill.Dec. 431, 386 N.E.2d 905 (emphasis supplied) citing 7 A Fletcher, Cyclopedia Corporations § 3620, at 248–49 (perm. ed. 1978). That policy speaks to the corporate financial health at time of the transaction to protect then existing creditors and bond holders.

Section 6 of the Act did not provide for retrospective second thoughts after post-purchase events modify the corporate financial picture a year later. This Court should not engraft such a change upon the structure. There is no authority for an interpretation that would put all stock redemption at risk to future events and uncertain management despite sufficient corporate financial health at the time of purchase. Otherwise sellers of stock in a transaction valid at the time would be at the mercy of future fortuities after they lost rights as stockholders to follow and influence corporate well-being. To the contrary, a corporation with sufficient "earned surplus" to acquire its shares "out of" such

---

**2.** "The view that the corporation need be solvent only at the time of the initial purchase of shares and not at the time of each subsequent installment payment would appear to be a sound view, at least as regards subsequent purchases." Vol. 1, *Illinois Business Corporation Act Annotated 3rd,* (West Pub. Co.) (1975) at pp. 72.

surplus on the date of the purchase, and which is able to pay its debts in the usual course of its business immediately before and after the transaction, has not violated Section 6.

Debtor's allegation of insolvency relates only to a date one year after the date of purchase and not immediately following the purchase. While plaintiff's rebuttal on this point is correct, the disposition of this point does not dispose of the case for reasons stated hereinbelow. Therefore, plaintiff's motion for summary judgment on the Fourteenth Affirmative Defense is denied, as well as debtor's motion thereon.

### 4. *Res judicata does not bar debtor's contest of the stock purchase.*

In his motion, plaintiff has also asserted that the doctrine of *res judicata* bars debtor from asserting the invalidity of the Purchase Agreement. The *res judicata* argument is based upon a 1981 Cook County Circuit Court case instituted by plaintiff against debtor for breach of the lease agreement and promissory note received as consideration for the stock share Purchase Agreement.

■ The doctrine of *res judicata* prevents the same parties or their privies from relitigating an action which has previously been adjudicated on the merits. That doctrine assures finality and not only includes matters brought into issue but also related matters which might have been litigated. *Cromwell v. County of Sac,* 94 U.S. (4 Otto) 351, 24 L.Ed. 195 (1876).

Plaintiff asserts that a judgment entered in the Circuit Court of Cook County, Illinois, on September 22, 1981, is *res judicata* to a defense pleaded under Section 6. The state court case was to recover unpaid rent under the lease received in the Purchase transaction and for acceleration of the note. The state court found the lease in default and awarded judgment to plaintiff but failed to find a breach of the note. Plaintiff claims that debtors should have asserted their Section 6 defense in the prior suit and are now prevented from doing so.

■ The doctrine of *res judicata* applies only to relitigation of the same claim or cause of action. The state court action apparently alleged default of the note and lease received as consideration for the Purchase Agreement. Though debtor might have interjected a Section 6 defense in that suit, it chose not to do so. But, it is not prevented from asserting such defense in a different cause of action involving the same parties. *Cromwell, Id.* at 356, 24 L.Ed. 195.

■ The action brought by plaintiff in state court alleged breach of a lease and note. The present action is a Complaint to Lift the Stay asserting a right to enforce the security agreement executed by debtor to secure payment of the note and lease obligation.

Though a security agreement is executed concurrent to a specific transaction, it is not the same as the underlying transaction out of which it grew. *Nesbitt v. Blazer Financial Services, Inc.,* 550 F.Supp. 819, 833 (N.D.Ill., 1982). A security agreement cannot be enforced until a default has occurred. ILL.REV.STAT. ch. 26, ¶ 9–501.

The state court found the lease here involved in default on September 22, 1981, two months prior to the filing of this petition in bankruptcy and two months before the note payment was due. Debtor has admitted that the note payment due November 20, 1981, went unpaid. The default on that date gave rise to a cause of action for enforcement of the security agreement. Such was a different cause of action than the earlier suit. Indeed, that new cause of action did not exist when the earlier suit was adjudged. The doctrine of *res judicata* is therefore inapplicable.

### 5. *Estoppel may bar debtor's Section 6 contest of the stock purchase.*

Plaintiff primarily argues that defendant is estopped to assert Section 6 because it and its sole shareholder Stefan knowingly entered into the transaction and accepted the benefits of the stock purchase.

Plaintiff also contends that as of the date of sale on November 20, 1980, the fair market value of the equity of L & S was $4,150,000, "based on an appraisal secured by, accepted by and agreed to by Williams and Stefan," basing that argument on the affidavit of Gary Williams, paragraphs 2 and 3. That implies that the parties agreed to accept that valuation for purposes of the instant sale. If so, the fair market value of L & S was such that its capital was not in fact impaired by L & S's purchase of Williams' stock. Indeed, debtor's own bankruptcy schedules filed herein a year later reported the same assets to have a fair market value of $1,969,739, apparently sufficient to avoid Section 6 a year earlier, and corroborative of the earlier appraisal which Williams and Stefan (on behalf of debtor) allegedly "agreed to" for purposes of the stock purchase.

By uncontradicted affidavit plaintiff has shown that L & S's corporate counsel and auditors each reviewed the transaction and gave opinions that it was lawful. L & S's corporate counsel, David F. Rolewick, had represented to Williams that the transaction was valid and legally binding on L & S, and Williams claims to have relied on this representation. Specifically, Rolewick stated:

"The Purchase and Redemption Agreement dated the 6th day of November, 1980, as signed by the officers of the Corporation on that date, and as ratified by the Board of Directors in their meeting of November 20, 1980, is *valid and binding upon the corporation* as to those terms of the Agreement which affect the Corporation." (Emphasis supplied.)

(Exhibit A—Affidavit of Gary Williams, paragraph 12; Exhibit 9 to Exhibit A—November 20, 1980 letter from Rolewick to Williams; Exhibit B—Arthur Andersen and Company Related Party Memo 12/31/80; Exhibit C—Arthur Andersen and Company General Risk Analysis)

Plaintiff further argues that Williams' sale of the bulk of his stock in L & S did not harm any of L & S's then-existing creditors. He contends that only Lake Shore Bank and Westinghouse Credit Corporation were creditors of L & S at the time of the stock redemption and continue to be creditors of L & S at present. However, he claims that both Lake Shore Bank and Westinghouse Credit Corporation were notified of the stock redemption and affirmatively acquiesced in the transaction. In fact, he says that both entities expressly released Williams from any liability in connection with the obligations owed to them by L & S. If the foregoing is proved, that would carry weight as an estoppel argument, since the public policy sought to be protected by Section 6 was protection for existing creditors. *Amer. Heritage Investment, supra,* 68 Ill.App.3d at 769, 25 Ill. Dec. 431, 386 N.E.2d 905. If all those creditors consented, it would be strange indeed to enforce in favor of the corporation and its sole shareholder a policy protection that those creditors did not want for themselves. Because the parties here did not comply with local General Rules 12(e) and (f) the court cannot conclude that those contentions about the creditors are not in dispute as triable issues.

It is further argued that Stefan engaged in a course of conduct to force Williams to sell his stock for roughly $1,000,000, said to be far less than its true value. Affidavit of Gary Williams, paragraphs 5 to 13.

Plaintiff also filed an affidavit claiming that Stefan initially agreed to buy all of the stock personally but later decided to have the corporation purchase most of it (83%). Debtor has not denied this assertion. Had the first agreement been consummated, though plaintiff may have had trouble receiving his money, he would not have confronted the possibility faced here that he might have to return the property received and be given back what is now worthless stock. Plaintiff's continued involvement with the corporation might have prevented the current situation. Further, he received

a personal guaranty of the note from Stefan and his wife. Invalidation of the agreement would appear to nullify that guaranty. Plaintiff would then receive little or no consideration for selling his stock and thereby discontinuing involvement with a corporation which he helped found and from which he was allegedly "forced out" by Stefan.

 To assert his estoppel argument in the face of the apparent violation of Section 6, however, plaintiff has a heavy burden. A contract made void by statute as being against public policy obviously cannot be made binding by estoppel. *Kyser v. Miller*, 144 Ill.App. 316 (1st Dist. 1908). The main support for the estoppel argument is asserted to be *In Re Reliable Mfg. Corp.*, 17 B.R. 899 (N.D.Ill.1981), *aff'd.*, 703 F.2d 996 (7th Cir.1983).

In *Reliable*, debtor was purchased by another corporation. As part of that transaction, purchaser gave the two seller/shareholders a security interest in the assets of debtor. Following debtor's petition in bankruptcy, sellers asserted their security interest in the assets. Purchasers then claimed the security agreement was invalid because it violated § 160 of the Delaware Corporation law—a section with different language but the same underlying intent as Section 6 of the Illinois Act (i.e., prohibiting impairment of capital). The facts as outlined in the reported *Reliable* opinions do not make clear what legal theory the purchasers were espousing, but it would appear they alleged insufficient corporate surplus.

In *Reliable*, Judge Marshall of our District Court affirmed summary judgment granted by the Bankruptcy Judge and agreed with plaintiff's estoppel argument. The District Judge held that a party that freely and voluntarily enter into and benefited from a transaction was estopped to later assert the invalidity of its agreement when the agreement "no longer serves its interest". *Id*, 17 B.R. at 904.

Judge Marshall assumed that Delaware Section 160 applied. He held that Libco (Reliable's corporate parent) was estopped to attack the validity of a transaction which

it had freely undertaken in order to purchase Reliable's stock:

"A party is estopped from asserting that a transaction which it freely entered and benefited from does not now bind it because of its invalidity.... It has long been the law that those who received notice that a corporation will purchase its own stock and then fail to object to the transaction cannot subsequently complain that the transaction was illegal." 17 B.R. 899, 904 (N.D.Ill.1981) (Citations omitted).

Because Libco in that case treated the security interest as valid and enforceable at the time of the stock purchase, it was held bound to continue to so treat it before the Court. Libco's participation in the stock transaction precluded it from attacking the transaction before that Court.

Libco appealed the District Court decision. *In Re Reliable Mfg. Corp.*, 703 F.2d 996 (7th Cir.1983). Reliable intervened in the appeal, arguing that it, unlike Libco, was not estopped to assert Section 160. *Id.* at 999. The Seventh Circuit stated that the appropriateness of applying Section 160 must be addressed in light of the purpose of that statutory provision. *Id.* at 1001. The prohibition against a corporation's acquiring its own stock when to do so would impair its capital was intended to protect creditors. *Id.* The Court pointed out that Section 160 was being raised instead by a shareholder by way of defense against the claims of creditors. *Id.* The financing statement challenged under Section 160 was what enabled the shareholder to purchase Reliable in the first place. *Id.* The Court noted that if the transaction had resulted at the time of the financing agreement in an impairment of Reliable's ability to pay prior creditors, then there were strong policy arguments that Section 160 should apply. *Id.* at 1002.

However, prior creditors there were not defrauded by the transaction, and all future creditors were on notice that Reliable's assets were encumbered. *Id.* Furthermore, the Court noted that Reliable was essentially an incidental party to the

transaction, which involved the sale of 100% of its stock rather that a reorganization of its capital structure. *Id.* Most important, stated the Court, the only parties seeking to raise Section 160 were Libco, which took advantage of the Guarantee in order to acquire Reliable's stock, and Reliable itself, Libco's wholly owned subsidiary. *Id.* Under those circumstances, the Court concluded that the policies underlying Section 160 were not implicated in the case. *Id.*

In the present case, Williams and Stefan were the sole shareholders of L & S before the subject stock purchase agreement was entered into. Williams sold his shares, and Stefan allegedly used the corporation, through a stock purchase agreement, to buy the bulk of Williams' shares. Stefan personally bought the rest of Williams' shares. Stefan caused L & S to issue a promissory note to Williams. That note was secured by a Security Agreement covering certain assets of the corporation. In addition, Stefan and his wife executed a Guarantee in favor of Williams, guaranteeing payment of the indebtedness of L & S to Williams.

*Reliable* was quite similar to the case at bar. Section 6 of the Illinois Business Corporation Act contains protection against capital impairment similar to that in Section 160 of the Delaware General Corporation Law. In *Reliable* the sole shareholder of Reliable was estopped from denying the validity of the stock purchase agreement. Similarly, in the present case Stefan is arguably estopped from denying the validity of the transaction through which Stefan, by his own acts, gained sole control of that corporation, and because he is sole shareholder of L & S it may likewise arguably be estopped. The transaction was approved by Stefan as the sole shareholder of L & S. Williams, like the former shareholders in *Reliable*, transferred all of his shares of L & S and thus made a substantial change of position.

Stefan now seeks to use the corporate nature of the transaction to nullify Williams' secured claim. Libco attempted to use the same argument in *Reliable* by having its wholly owned subsidiary (Reliable itself) intervene in the Circuit Court proceedings and claim that it (Reliable) was not estopped to raise Section 160 of the Delaware General Corporation Law. *In Re Reliable Manufacturing Corp.*, 703 F.2d 996, 999 (7th Cir.1983). The Seventh Circuit found that Reliable was essentially an incidental party to the transaction, with a unity of interest with Libco, and not intended to have the protections of Section 160. *Id.* at 1002. The Seventh Circuit opinion describes the situation in *Reliable* in words that may well apply to the case at bar, depending on evidence that may be presented:

> "In fact, all of the elements of a classic estoppel situation are present: reliance by Leigh and Dusek upon the guarantee and a substantial change in their position, in that they gave up ownership in all of the stock of Reliable." *Reliable*, 703 F.2d at 1003, n. 7.

Defendant argues that *Reliable* rested on Delaware law which, unlike that of Illinois, permits inquiry into the reasonableness and impact of a challenged transaction. But *Reliable* turned not on whether the transaction involved was void or merely voidable depending on circumstances. It turned rather on an application of estoppel principles to reach a just result and avoid inequity. Moreover, the Illinois courts have not expressly shut the door to application of estoppel to Section 6, *American Heritage, supra,* 68 Ill.App.3d at 767, 25 Ill.Dec. 431, 386 N.E.2d 905, and this Court declines to do so when not mandated by Illinois law and where the precedent of Reliable is logically applicable here. Indeed, since Illinois has since modified the very provision that might have barred this suit, it is even more appropriate that estoppel be recognized as available under the several facts alleged as a possible bar to the assertion of the Section 6 defense.

6. *Plaintiff's effort to pierce the corporate "alter ego" of Stefan must also await trial.*

Plaintiff also contends that Section 6 was not meant to protect debtor because debtor

is the "alter ego" of Lawrence Stefan, in that Stefan became sole shareholder of debtor after consummation of the purchase transaction.

 A corporation is a separate entity which is solely liable for the actions performed in its name by its employees. In some instances, a sole shareholder will utilize the corporate structure to defraud creditors for his personal benefit. In those instances, the courts will treat the shareholder as the "alter ego" of the corporation and hold him personally liable for the corporate obligations. *Federal Ins. Co. v. Maritime*, 64 Ill.App.3d 19, 20 Ill.Dec. 664, 380 N.E.2d 873 (1st Dist.1978).

 Plaintiff now contends that debtor is the "alter ego" of Stefan, that corporate law does not apply to individuals, and therefore Section 6 should not be in issue here. The "alter ego" theory requires "such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist". *Fed. Ins. Co., Id.*, 20 Ill.Dec. at p. 671, 380 N.E.2d at p. 880 (quoting 19 C.J.S. § 839, p. 264). The concept is applied when the corporation is doing the sole shareholder's personal business and the corporation exists solely to protect that shareholder from liability.

In this case, debtor had prior to the stock sale been equally owned and operated by plaintiff and Stefan for over five years. During that period, it increased annual sales to over two million dollars. Plaintiff's argument that debtor became a shell corporation for Stefan's fraudulent activities at the moment the transaction occurred would seem a difficult one to advance. However, that issue has certainly not been supported by either side for purposes of summary judgment and must be tried along with the rest of the case.

7. *All summary judgment motions must be denied and consideration given to this Court's jurisdiction over counterclaims.*

The standards for ruling on motions for summary judgment are clear. Summary judgments may only be granted when it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1339 (7th Cir., 1985). Movant has the burden of showing there is no issue of material fact and all doubts as to the existence of an issue of material fact must be resolved against him. *Id.* Summary judgment should not be awarded until those standards can be met to a certainty.

Given the dispute over some facts, the nature of the estoppel argued here and the different perspectives and arguments over the significance of facts pertinent thereto, it would be improper for the Court to grant summary judgment for either side on the Thirteenth and Fourteenth Defenses. Moreover, even if plaintiff establishes the estoppel as a bar to assertion of the Section 6 defenses, there are other defenses and counterclaims pleaded to the complaint.

Finally, but not at all least important, the parties have not in their briefings focused on the bankruptcy issues pertinent to stay litigation. Because of the failure to follow General Rules 12(e) and (f) of this District Court, there was no focus on the issues under § 362(d) of the Bankruptcy Code of asset value, need for the assets in reorganization, and adequacy of protection in the light of the large security interest of Lake Shore National Bank. In that regard, ¶ 10 of the Complaint was denied and debtor has denied that the present asset value is insufficient to pay both plaintiff and the Bank in full should plaintiff's claims be valid. There remain triable issues on that question.

Therefore in no sense is this case ripe for decision by summary judgment, and all motions for summary judgment will be denied.

As the parties and Court now turn to preparation for pretrial and trial, attention must therefore be focused on questions of this Court's jurisdiction over the counterclaims.

*Conclusion*

Accordingly, this case is set for status report on May 16, 1986 at 10:30 A.M. and for filing of authority by both sides as to this Court's jurisdiction over the counterclaims filed herein. At that time and date, the Court will enter a preliminary pretrial order and set a date to close discovery, after receiving the views of counsel as to time reasonably required for discovery.